FIRST NATIONAL BANK OF WELLINGTON v. MANSFIELD SAVINGS BANK.

**1. POWER OF CASHIER TO MAKE CONTRACTS.**

The cashier of a bank cannot make for his bank a contract, in regard to a subject matter outside of the usual and customary business of the bank, and outside of the business usually performed by cashiers.

**2. COMPETENCY OF INSTRUCTIONS BY PRINCIPAL TO AGENT.**

Where an agent has had definite instructions not to act for his principal in a matter outside of his duties as an agent, the principal may show such instructions where he is sought to be held for the acts of his agent contrary to such instructions.

**3. CHARACTER OF AGENCY OF DIFFERENT BANKS RECEIVING A DRAFT FOR COLLECTION.**

Where a bank in this state receives for collection a draft, payable in this state and for the same purpose forwards the draft to its correspondent in Pennsylvania, and the bank in Pennsylvania forwards it for like purpose to another bank in Ohio, where it is payable, such last named bank is the agent of the bank in Pennsylvania, and is not the subagent of the bank in Ohio that first received the draft. The bank in Ohio where the collection is to be made is responsible for its negligence to the Pennsylvania bank only.

**4. OBLIGATION OF ONE WHO IS LIABLE ON ONE OF TWO SEPARATE CLAIMS TO DEFEND AGAINST BOTH CLAIMS.**

If M. is sued on two separate claims, and W. is liable to M. on one of the claims if M. has it to pay, but is not thus liable on the other claim, and M. when sued notifies W. of the pendency of the suit, W. is under no obligation to defend the suit involving both claims, and if judgment is obtained against M. for the sum of both claims, M. cannot recover from W· a part of the costs and attorney fees in the suit against him.

CALDWELL, J.

The Mansfield Savings bank in its petition against the First National bank of Wellington says: That on the 5th day of December, 1881, the firm of Crawford and Taylor drew a draft for $61.46 at one day's sight on Smith and Jordan of Wellington, O., payable to the order of R. Brinkerhoff, cashier, and deposited said draft with plaintiff for collection. Plaintiff says that it sent said draft through the usual course of business for collection, and that the defendant received the draft on the 9th day of December, 1881, four days after it was drawn, and presented it for acceptance; it was accepted; they then held the draft until the 20th day of January, 1882, when they returned it.

Then another draft of $36.54 was drawn by the same parties, Crawford and Taylor, on the same persons, Smith and Jordon, of Wellington. That was sent by the Mansfield bank directly to the First National bank of Wellington. This draft was made on the 3d day of January and was sent to the First National bank of Wellington and presented and accepted on the 5th day of January, and that was returned on the 19th day of January.

The First National Bank of Wellington v. The Mansfield Savings Bank.

Crawford and Taylor brought suit against the Mansfield Savings bank, Smith and Jordan having failed about the 19th or 20th of January, 1892. Crawford and Taylor brought the suit against the Mansfield Savings bank to recover the amount of these two drafts, claiming that the bank either itself or through some one after sending it had been guilty of negligence in holding these drafts at the very time when if they had been returned they themselves could have collected them or at least got them secured. And that being the case, that the Mansfield bank was responsible to them for the amount of these two drafts. They say that after they were sued before the justice of the peace in Mansfield they notified the First National bank of Wellington they were sued, and asked them to take charge of the suit, as the responsibility, being on it, must finally rest on that bank.

It is claimed that at one time while the case was pending before the justice of the peace, Horr, the cashier of the First National bank of Wellington went down to Mansfield, and that he had written several letters before that to them. But these letters are now lost; they are not produced on the trial of this cause; and they say that while there he made an arrangement and employed the attorneys of the bank at Mansfield to look after that suit; that in addition to that they say those letters that were lost stated that they would do this, and asked Brinkerhoff the president of the savings bank at Mansfield to secure attorneys to look after this suit at the expense of the Wellington bank.

There are three parties who testified that when Mr. Horr was in Mansfield he made this arrangement, and took upon the bank that he represented at Wellington the responsibility of looking after the litigation in Mansfield. Mr. Horr claims and testified that he made no such arrangement, that he went to Mansfield for the sole purpose of testifying in that case, intending to show by his testimony if possible that he simply held these drafts for collection; that that was the custom and the rule where papers were marked " no protest."

And that they not being paid, the parties having failed to show by his testimony that there was no time while they held these two drafts that they could have possibly been collected from Smith and Jordan. This was one point at issue between the parties upon the evidence. The defense to this action set up that the first draft that was sent, which was a sight draft, or due one day after sight, was sent to the Pittsburg Bank by the Mansfield Savings Bank, and the Pittsburg Bank sent it to the First National bank of Wellington for collection. This is not denied at all, but is admitted.

It is plain that the bank at Wellington is not responsible to the Mansfield bank but only to the Pittsburg Bank, and the Mansfield Bank must look to the Pittsburg Bank for the payment of that draft, if they can make a case against that bank. Then that leaves the facts of this case standing this way : Was or was not Mr. Horr, the cashier of the bank, an agent capable of making the arrangement that it is claimed he made at Mansfield? And secondly, has any evidence been shown if he was not by reason of his being cashier of the bank capable within that agency of making that contract; was he in any manner qualified or authorized by the bank to make that arrangement, and did the bank thereafter ratify that arrangement?

These are the facts in this case. And the second question is this, Is the bank at Wellington liable directly to the Mansfield Bank upon the draft that was sent to them through the Pittsburg Bank? The next question that arises is, Was the bank at Wellington compelled, after having been served with notice, to defend the suit in Mansfield against the Savings Bank there as to the second draft which was sent by the Savings Bank directly to the First National.

As we have said, the facts appear clearly as I have stated them, and these issues are raised in this bill of exceptions.

Mr. Horr was unquestionably the cashier of the First National at Wellington; he undoubtedly went to Mansfield. He testified that he went there for no other purpose than to give his testimony upon the trial of that case.

The Savings Bank has introduced no testimony except the fact that Mr. Horr while there entered into an arrangement, and by letters written before he went there that he would enter into such an arrangement, and that he did while

there enter into an arrangement or agreement to prosecute that suit. Now, we think the law is clearly that the cashier of a bank has not by reason of his agency as cashier—that it is not within the scope of that agency that he should have made the contract that the Mansfield Savings Bank claims he did make.

It was necessary to show that he had authority to make the contract; that proof devolved upon the Savings Bank of Mansfield. It was not necessary to prove the agency of Mr. Horr—that was admitted; he was the cashier of this bank; but the extent of that agency, whether that agency was extended by the bank to include this arrangement it is claimed he made at Mansfield, was a matter that must be proved. There is no proof, whatever, upon that subject. Nor is there any ratification of anything he did there in this evidence. It is claimed that the bank at Wellington undertook to take depositions to carry out this arrangement, but what was done there—everything that was done—was done by Mr. Horr, so if he had no authority to make the arrangement at Mansfield, he certainly had no authority to carry it out.

During the trial of this case the bank proposed to show that Mr. Horr had no authority to make such an agreement.. There was evidence that the Savings Bank was endeavoring to get the First National to take upon it the burden of that suit in Mansfield, and I have no doubt but that that fact came to the ears of the officers of the bank, and the officers of the bank met and took action upon the matter, and this testimony was offered in regard to that.

Q. You may state whether you received any instructions from the directors? (when Mr. Horr was on the stand). A. I did.

Q. What was it?

To this question the plaintiff objected, and the court sustained the objection and the defendant then and there excepted. And then the attorney for the First National made a statement of what he would prove by the answer to that question. "I offer to prove that the board of directors instructed him to take no steps whatever toward assuming the defense of that suit or employing any attorneys, but simply to give the testimony and give what facts he had as cashier, and that the board considered this in meeting and gave him directions of that sort.

But this question was as to what directions were given him. It may be said that this was excluded because it must have been in writing, but this is not true. Where any corporation—all corporations are supposed to keep a record, but it is well known they do not record all their doings in that record, and if it is not recorded it may be shown by oral testimony, and it does not appear here whether there was or was not any record of that board wherein they gave instructions to Mr. Horr, and it was error in the court to exclude that testimony until it was positively known that it was in writing. The instructions that were given to Mr. Horr by the directors of the bank.

We think the court erred and the error was prejudicial, because this evidence would have shown, as it was claimed by the attorney here and he offered to show the witness would answer, that the bank instructed him to have nothing whatever to do with the prosecution of that suit in Mansfield, of that defense, and the case should be reversed on account of this error. In the next place it is claimed by the bank of Mansfield that judgment having been obtained against it, that the First National is bound by the amount that was recovered against it, the Savings Bank at Mansfield.

One draft sued on was not sent directly to the First National but to the Pittsburg Bank, and then by the Pittsburg Bank here; that raises the question of whether there was any contract between the Mansfield Bank and the First National, and the authority in this state is that there was no contract relation. That the Wellington Bank was not the agent of the Mansfield Bank, and that there was no contract relation between them. And the authority in this case in the case of *Reeves, Stephens & Company* v. *The State Bank of O. 'o,* 8 O. S., 465, was a case where Reeves, Stephens & Company presented a paper to the Commercial Bank of Toledo for collection; the Commercial Bank of Toledo sent it to the American Exchange Bank of New York; the Commercial Exchange Bank of New York made the collection and about the time this col-

lection was made the Commercial Bank of Toledo failed; that was a branch bank of the State Bank at Columbus, and the Ohio State Bank became responsible for its liability, and was entitled to all the assets there were when this was collected. The Ohio State Bank was entitled to the money collected on it and was liable to Reeves, Stephens & Co., of Cincinnati, either as creditors or as money held in trust for them or held especially for them, and this was one of the questions that was tried in the case; but has nothing to do with this matter. BRINK-ERHOFF, judge, in his opinion in this case says, that the case might be considered in this light: that Reeves, Stephens & Co. had sued directly the American Exchange Bank of New York, and then considered it in that light. In that case it was held that Reeves, Stephens and Co. could have no claim whatever against the New York Bank. That determines this case. The Mansfield Bank sends this paper to Pittsburg, and the Pittsburg Bank sends it directly to the Wellington Bank. The Mansfield Bank having sent through the Pittsburg Bank and the Pittsburg Bank to the Wellington Bank, makes the precise case that was in the 8th Ohio St., that I have referred to. And if we follow that ruling we must hold in this case that the Mansfield Bank had no cause of action on that first exchange against the Wellington Bank. It was contended by the Mansfield Savings Bank that even if no contract was made by Mr. Horr with the Mansfield Savings Bank, that notice to them of the pendency of that suit, and knowing as they did if there was any liability by reason of the neglect, that that neglect was on the part of the Wellington Bank, and that mere notice to them of the pendency of that suit in Mansfield was sufficient to compel them to defend that suit, and if they did not defend in that suit they were bound by the judgment so far as the amount of the judgment was concerned.

Admitting now that is the rule, that even notice is sufficient where the party is liable, yet this case is not the usual case. We find here two claims sued upon in Mansfield. The bank in Mansfield sues upon two claims. It had a claim, if it was liable, directly against the Wellington Bank, on one of those claims; but had no claim on the other on the Wellington Bank. That then brings us to this question of law: If a party is sued, and, if he is compelled to pay, he has a right to look to a third person to make good the judgment that may be obtained against him, if he is sued and there is notice to this third party, then the third party is bound by that judgment, we will say. But here is a case where the party has sued upon two claims, on one of them the third party was liable to the party sued; and on the other the third party was not liable to the party sued. Is the party who is ultimately liable on one of those claims bound to step in and defend that suit where he is not liable to the party sued upon the other claim? And we clearly think the law is that he is not liable unless he contracts to defend that suit.

The court charged if Mr. Horr made a contract and a legal contract, a lawful contract to defend that suit against both of those claims, that then the bank could recover in this action, and we find no fault with that. We think that although the Wellington Bank was not directly responsible to the Mansfield Bank on the first draft, yet it was evident that they were ultimately liable to the Pittsburg, and the Pittsburg to the Mansfield Bank, and that if the Wellington Bank contracted to defend that suit, as to both of these claims, we think there was consideration enough in this matter of their ultimate liability to make that binding; but we do not find any testimony showing that Mr. Horr had any right to make any such arrangement, so the question is left to this, Was mere notice upon the Wellington Bank sufficient to bind it to the judgment against the Mansfield Bank as to the second draft. The court in its charge to the jury said that would bind them. That is, if they had notice of the pendency of that suit. The Mansfield Bank had a right to sue the Wellington Bank upon part of that judgment, and the Wellington Bank had notice of the pendency of that suit, then the jury would be warranted in adding to the amount of the judgment obtained upon that part claimed, a reasonable part of the expenses, such as a proportion of the costs of the Mansfield suit and attorney's fees. That was error on the part of the court below; because we think the Wellington Bank could not be

bound to the Mansfield Bank on a part of that judgment, unless they contracted to defend that suit because of the reasons as I have before stated, that they were not bound to defend so far as their obligation to the Mansfield Bank was concerned. Upon mere notice the Mansfield Bank cannot hold the Wellington Bank to a part of a judgment where it was not liable to the Mansfield Bank upon another claim entering into the same judgment. There was considerable testimony offered as to the mode of dealing between the Mansfield Bank and the Wellington Bank. The Wellington Bank claimed it had become a custom, between these two banks, for the Wellington Bank when it received a paper marked " no protest " to hold that paper and try to collect it, in at least a reasonable time, and then return the paper if not collected, and if collected then return the money.

It was claimed on the part of the Mansfield bank there was no such custom between these two banks, and this matter was submitted to the jury. It is clearly shown by the testimony that considerable paper passed—a great number of pieces of paper passed between these two banks—presented to the Wellington bank by the Mansfield to collect. And quite a number of other papers that were sent to the Wellington bank, by sending through other banks, sending to other banks first, and then to the Wellington bank, and the same course was pursued with all those papers that was pursued with these papers here, except that this paper was held a little longer; but so far as there is any evidence upon that subject at all it seems to be all one way—that it was the customary way of doing business, when such paper was received, for the Wellington bank to hold it and try to collect, and as long as it had a reasonable show of collection, and return the money after collection. One of the drafts here in question was sent on the 5th day of December, 1881, it was presented for acceptance, and accepted on the 9th day of December, 1881. Now, from the 9th until the 3d of January, 1882, it would be twenty-five days. The paper had not been returned to the Mansfield bank. Then the Mansfield bank sent the second draft here in question; but so far as is shown in the record not one word was said as to why the other draft was not returned, and if it had been collected why the proceeds were not returned. The bank at Mansfield seemed, so far as this record is concerned, to rest satisfied that the Wellington bank was pursuing the usual course of business between the two banks; so that the testimony in this respect was substantially all one way—that this was the custom between these two banks. That question was submitted to the jury, submitted by special finding to the jury, and the jury found against that custom, and so clearly against the whole testimony, we may say, that the case will have to be reversed also on that ground, that was against the testimony. The plaintiff claims that it was the custom with the banks in Ohio, especially northern Ohio, to hold a paper that was marked "no protest"—to hold that paper for collection after it had been accepted, to hold it as long as there was any reasonable show of getting it. That is, a reasonable length of time. Now, Mr. Warner, who has been a banker for a great many years, Mr. Horr, Mr. Hill of this city, and one or two others testify that was the custom and there is nothing to contradict it, and the only thing that is said against this is this, that the parties who were on the witness stand kept saying so far as I know, so far as our experience goes, so far as we have handled papers for other banks, and so far as they have sent it to us, that has been our way of doing. Yet, all of these witnesses did say it was the general custom among banks in northern Ohio to do that way. And there is not any testimony in this bill of exceptions looking any other way. No witness is called to say there was no such custom or that it was not universal, or was no such party dealings in northern Ohio, to be called such custom, and we think the jury erred in finding there was no such custom. Of course the holding of this paper—the bank here may justify its holding this paper, and yet be so negligent in trying to collect the paper that they would be liable, but the evidence shows they ought not to be liable by reason of holding the paper simply, and for that reason we think the jury erred, and upon these various errors we reverse the case.

*Boynton & Horr*, for Plaintiff in Error.

*Kerr & McBride*, for Defendant in Error.